*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

In re BUSICK, Minors.

UNPUBLISHED
July 27, 2023

Nos. 364110; 364162
Delta Circuit Court
Family Division
LC Nos. 17-000337-NA
17-000338-NA
17-000339-NA
17-000340-NA
17-000342-NA
19-000492-NA
20-000553-NA

Before: GLEICHER, C.J., and JANSEN and HOOD, JJ.

PER CURIAM.

In these consolidated appeals, respondent-mother and respondent-father appeal as of right the orders of the trial court terminating their parental rights to seven of their children under MCL 712A.19b(3)(c)(*i*). We affirm.

## I. BACKGROUND

This appeal originates from termination orders related to seven of respondents' nine children. All of the nine children were under the trial court's jurisdiction at one time or another. Ultimately, however, the court only terminated respondents' parental rights to the seven youngest. Respondents' oldest daughter, AB1, was included in the original petition, but the court dismissed her from the case when she turned 18 years old in late April 2021. After petitioner, the Michigan Department of Health and Human Services (MDHHS), filed the original petition in November 2019, respondent-mother gave birth to respondents' ninth child, SB, and MDHHS filed a supplemental petition adding him to the case. At the conclusion of the termination hearing in 2022, the court declined to terminate respondents' parental rights to TB1, their second oldest daughter, who would turn 18 years old eight months after the termination hearing. Consequently, only respondents' parental rights to the following seven children are at issue in this appeal: TB2,

IB, CB1, CB2, AB2, EB, and SB. At the time of termination, these children ranged in ages from 1½ to 15 years old.

Respondents' history with Children's Protective Services (CPS) dates back to 2008 when they were first investigated for complaints that they physically neglected the three oldest children: AB1, TB1, and TB2. During the 10 years that followed, respondents had six more children and CPS investigated additional neglect complaints on multiple occasions. Initially, CPS offered respondents preventative services in an effort to avoid court intervention and removal of the children. After approximately 10 years of voluntary services, however, MDHHS concluded that respondents continued to expose the children to risks of harm. Consequently, in December 2017, MDHHS petitioned the court to exercise jurisdiction and remove the children from the home because of its unsanitary and deplorable condition.[1] In the two years that followed, respondents apparently participated in and benefited from a treatment plan designed to address their unsuitable housing and poor parenting skills. Eventually, in February 2019, contrary to MDHHS's recommendations, the trial court returned the children to respondents' care and closed the case.

Although the record is somewhat unclear, it appears that sometime in 2019, respondents reported discovering TB2 inappropriately touching his younger sister, IB. The record suggests that this contact was of a sexual nature and occurred in an old camper on respondents' property. The events precipitated a juvenile court action and, apparently, respondents, TB2, and IB participated in family counseling.

The children's return home after the conclusion of the 2017 to 2019 case was relatively short-lived, only nine months. In mid-November 2019, a passing motorist found AB2, then three years old, walking alone on the shoulder of M-35, a busy highway in Michigan's Upper Peninsula. The motorist picked up the child, went to respondents' home, and, when no one answered the door, called the police. The police arrived at the same time that respondent-mother was returning home from dropping off her older children at school. When CPS arrived at the scene, they noted that respondents' home was in a deplorable condition. The house was littered with garbage, toys, clothing, and other household items, most of the flooring could not be seen, and clutter obstructed stairways and doorways. Respondent-father, an employee of a railroad company, was at work at the time.

The next day, MDHHS filed a petition seeking termination of respondents' parental rights to their then-existing eight children under MCL 712A.19b(3)(g) and (j). The petition alleged that respondents' home was unsanitary and in a condition unsafe for the children. At the preliminary hearing on the petition, the court formally removed the children from the home. Eventually, the four oldest children (AB1, TB1, TB2, and IB) were placed with relatives, and the youngest four children (CB1, CB2, AB2, and EB) were placed in licensed foster homes. During the pretrial hearing that followed, the matter was set for a jury trial in March 2020.

While respondents awaited trial on the 2019 petition, respondent-mother gave birth to SB in early October 2020. Four days after SB's birth, MDHHS filed a petition requesting that the trial

_____

[1] At that time, seven children were removed from respondents' care. EB and SB were not yet born.

court also take jurisdiction over SB and remove the newborn from respondents' care. In late October 2020, after MDHHS agreed to remove the request for termination of parental rights from the 2019 petition, respondents entered pleas of admission in which they admitted that respondent-mother left three young children unsupervised in the home, that then three-year-old AB2 was found wandering unsupervised on a busy thoroughfare, and that the home was in a condition unfit for the children. The trial court then exercised jurisdiction over the children. During the dispositional hearing that immediately followed, the court ordered respondents to comply with and benefit from a treatment plan designed to enhance their parenting skills and improve the condition of the home.

In January 2021, the trial court granted MDHHS the discretion to permit respondents to have overnight visits with AB1, TB1, and TB2 (the three oldest children). The court included as a condition of the extended visits that respondents establish that respondent-father's renovations to the home were up to code. In mid-April 2021, the trial court returned these three children to respondents' care, but respondents' parenting time with the six youngest children remained supervised.

In late April 2021, AB1 turned 18 years old. In early July 2021, at the request of MDHHS, the trial court terminated its jurisdiction over AB1. Thereafter, AB1 continued to live in respondents' home. In late July 2021, the trial court held a review hearing. During the hearing, the court indicated that it would consider unsupervised visitation with the younger children if the parties developed a plan contemplating the implementation of incremental unsupervised visitation. Consistent with the court's directives, in early September 2021, the parties entered into a stipulation whereby they agreed that respondents appeared to have made sufficient progress to warrant unsupervised parenting time with the six youngest children. The trial court then scheduled the visitation matter for an evidentiary hearing.

At the early October 2021 evidentiary hearing, several witnesses testified regarding the propriety of permitting unsupervised parenting time with the younger children. Jessica Chevalier, a foster care specialist, testified about an incident during which TB2 started a large fire on the driveway. Amanda Bloxton-Kippola, the visitation supervisor who worked for UP Kids, an entity providing parenting services, witnessed the fire. Their testimony established that TB2 started the fire by using approximately one quart of gasoline in an attempt to shoot off a metal pipe-cannon he had built. Apparently, TB2 assembled a dismantled propane torch that he found in the garage to light the fire. Chevalier testified that the lighters were supposed to be locked in a camper on the property, but she had discovered the camper unlocked at various times. This was actually the third instance in which TB2 was caught starting a fire. Chevalier also testified that TB2 recently "sprayed bug spray over lit candles." Respondent-father admitted that TB2 had been exhibiting an increased interest in fire and denied minimizing the events. Respondent-father asserted that after the caseworker left, he discussed the events with TB2. He also testified that the garage was now locked. According to respondent-father, had the fire reached the gas cans stored nearby in the garage, the house and the garage could have burned down. Despite the parties' stipulation, the trial court denied respondents' request for unsupervised parenting time.

The trial court held a permanency planning hearing in mid-December 2021. During this hearing, the court learned that after TB1 and TB2 returned home in April 2021, they missed approximately 40 days of school. At the conclusion of the hearing, the trial court ordered that the

permanency plan be changed from reunification to adoption. The court also ordered MDHHS to file a petition to remove TB1 and TB2 from respondents' care, which MDHHS filed the same day.

In early January 2022, MDHHS filed a supplemental petition seeking termination of respondents' parental rights to their eight minor children under MCL 712A.19b(3)(c)(*i*) and (g). The petition detailed the mid-November 2019 events precipitating the 2019 petition and removal of the children. It also alleged that during the more than two years the children had been in care, respondents had been offered and completed many services. But despite this assistance, the petition alleged, there had been numerous instances of improper supervision that placed the children at risk of harm. These alleged incidents included the fires started by TB2, SB falling down the stairs, the children entering an unsafe camper that respondents were supposed to keep locked, the presence of bedbugs in the home, and TB1's and TB2's truancy.[2]

The hearing on the permanent custody petition began in early April 2022. At the outset, the trial court bifurcated the matter into a statutory-ground phase and best-interest phase. The testimony presented in early April 2022 related primarily to the statutory grounds to terminate parental rights. Truancy Officer Amy Calouette testified about TB1's and TB2's truancy. In November 2019, the school system referred TB1 and TB2 to Calouette for investigation of their poor attendance record. After the referral, however, CPS removed TB1 and TB2 in mid-November 2019. Calouette later learned from the guardian ad litem that TB1's and TB2's school attendance had improved since the removal. She therefore decided to end her investigation. But in late 2021, the school contacted Calouette, again raising concern about TB1's and TB2's attendance. Calouette investigated and concluded the two teenagers had missed approximately 60 of the 70 days of school. She also indicated that TB1 and TB2 had previously been removed from respondents' home and were placed with relatives in mid-December 2021. According to Calouette, after removal, both teenagers' attendance and grades markedly improved.

Tonya Maycroft, a visitation supervisor, also testified at the April 2022 hearing. She testified that she had supervised respondents' parenting time since 2020, and that she had worked with the family in 2018, during the earlier case. Maycroft opined that although respondents were "very calm people," they were simply overwhelmed and the children were "completely out of control." She believed that the circumstances had worsened since she worked with the family in 2018. In Maycroft's opinion, respondents' interaction with the children was inappropriate and inconsistent. Respondents were unreceptive to Maycroft's suggestions and the visits were chaotic. Respondents had difficulty controlling the younger children, who frequently slapped and bit each other and broke things. Maycroft also testified about her visits to the family home for parenting time. Though cluttered, Maycroft did not deem their then-current home "unfit." She described a chaotic environment. The children played in the basement and climbed on tall dressers and a china

---

[2] After MDHHS filed the January 2022 permanent custody petition, the trial court determined that the December 2021 petition for removal had to be adjudicated before any hearing on the supplemental petition to terminate parental rights. At an early March 2022 hearing, the court found probable cause to authorize the December 2021 removal petition. It further found that, once again, TB1 and TB2, came within its jurisdiction. The trial court and the parties then agreed that the removal petition would be "folded" into and heard concurrent with the permanent custody petition.

cabinet, and respondents rarely checked on them. AB2 frequently left the home, on one occasion, leaving the house and jumping on the trampoline in the dark unsupervised for more than 10 minutes. On another occasion, Maycroft had to inform respondents that AB2 was in the unlocked camper. According to Maycroft, respondents did not like confronting the children about their behavior for fear of "set[ting] them off . . . ."

Maycroft also testified that, in January 2022, parenting time was moved to a church because of a bedbug infestation in respondents' home. As of an early April 2022 hearing, visits remained at the church. During these church visits, the younger children frequently ran out the doors and Maycroft had to alert respondents that the children left. She further testified that although a parent-child bond existed with both parents, there was a stronger bond between respondent-father and the children.

The court also heard from Bloxton-Kippola and Alysa Cherubini-Sutinen, supervisors with UP Kids, who testified about respondents' participation in the "Parenting for Success" program. Respondents' curriculum with the program was designed to teach them to implement discipline techniques. According to Cherubini-Sutinen, respondents inconsistently implemented these techniques. Although Cherubini-Sutinen acknowledged only briefly observing respondents with their children, she opined that they benefited from the Parenting for Success program. She conceded, however, that the truancy issues of the children might change her perspective regarding the degree to which respondents benefited from the program. Bloxton-Kippola also indicated she was present at the home when TB2 started the October 2021 fire, and on an occasion when SB fell down the stairs. Cherubini-Sutinen also testified about these two incidents, in addition to another incident where SB wrapped yarn around his neck.

Chevalier also testified at the April 2022 termination hearing. Chevalier started working with respondents in November 2019, though she had known them since 2017. She indicated that although the Parenting for Success staff concluded that respondents benefited from their program, Chevalier did not notice a significant change in respondents' parenting skills. She also noted that, at the time they found progress on the program, none of the children were in the home. Chevalier also believed that respondents lacked an understanding of age-appropriate expectations for the children, neglected the children's educational needs, and had not improved their parenting skills. In particular, respondent failed to address disciplinary issues. According to Chevalier, they did not consistently discipline, redirect, or consistently provide feedback to the children. Their poor parenting, Chevalier testified, also created safety issues for the children, including inadequate supervision around the trampoline, leaving toxic chemicals in the children's play area, and allowing TB2 access to materials that allowed him to start the driveway fire. Chevalier also expressed concerns about respondents' failure to secure the camper stored on the property. And, critically, there were reports that there was "inappropriate touching" and "[s]exual boundaries being crossed between [TB2] and his sisters," IB and CB1.

Chevalier also noted that respondents improved their financial situation after receiving financial management education. She believed, however, that 2021 was a "strange" year because respondents received pandemic funds, MDHHS provided them financial assistance, and they did not have to pay to support eight of their children when they were removed during the case. Chevalier also noted that the cleanliness of respondents' home had improved. Even so, she remained concerned for the children's safety should they be returned. Chevalier was also

concerned about the truancy issues with TB1 and TB2 when they returned home in 2021, noting that they frequently participated in extracurricular activities despite missing school. She also noted that when the children were removed and placed again with relatives, their attendance improved. And although Chevalier admitted that respondents were largely compliant with their treatment plan, she concluded that they had not benefited from the services. She opined that they did not consistently implement the skills they were taught, and they frequently "lack[ed] the follow through for the things that [they were] taught." Chevalier therefore opined that the conditions that led to adjudication continued to exist, and, based on respondents' history and lack of benefit from the services provided, respondents' ability to properly parent and supervise their children would not improve within a reasonable time.

After Chevalier's testimony, the parties made their closing arguments and the trial court took the statutory-grounds issue under advisement. In early May 2022, the court found clear and convincing evidence to terminate respondents' parental rights under MCL 712A.19b(3)(c)(*i*).[3] The trial court noted that the children came into care because of improper supervision and unsuitable housing, calculated that it had been 525 days since the issuance of the initial dispositional order, and found that respondents had been offered many services designed to remove the barriers to reunification. The court concluded that although respondents participated in their parent-agency treatment plan, they did not benefit from the services offered. It found that not only had circumstances not improved, "they've gotten worse." And it found that respondents continued to be unable to properly supervise their children and, as a consequence, the children were placed in dangerous situations. The trial court also concluded that, considering respondents' history, it was unlikely that the conditions that led to the adjudication could be rectified within a reasonable time. It therefore found that there was clear and convincing evidence to terminate respondents' parental rights under MCL 712A.19b(3)(c)(*i*).

The matter proceeded to the best-interest phase and hearings were held over the course of three days in June and August 2022. At the start of the early June 2022 hearing, Chevalier reported that TB1 and TB2 were placed with their maternal grandparents, IB and CB1 were placed with their maternal aunt, CB2 and AB2 were placed with a licensed foster mother, Debra Hirn, and EB and SB were placed with another licensed foster mother, Holly Ryno. Chevalier recounted the efforts made toward reunification, then discussed whether termination was in the best interests of each child. She opined that termination was in the best interests of TB2, IB, CB1, CB2, AB2, EB, and SB, but not in TB1's best interests.

After Chevalier's testimony regarding the children's best interests, MDHHS rested. The trial court, however, adjourned the matter to allow testimony from the children's caregivers. In mid-June 2022, the caregivers—the maternal grandfather,[4] the maternal aunt, Ryno, and Hirn—testified about the respective children placed with them. The mid-June 2022 hearing concluded with testimony from the paternal grandmother, who testified on respondents' behalf. She believed

---

[3] The trial court found termination under MCL 712A.19b(3)(g) was not supported by clear and convincing evidence, so it declined to terminate respondents' parental rights under that statutory ground.

[4] At the time of the mid-June 2022 hearing, the maternal grandmother was hospitalized.

respondents had made progress and deserved a chance to parent their children, opining that it was not in the children's best interests to terminate respondents' parental rights.

On the final day of the best-interest hearing, respondent-mother testified on her own behalf. She indicated that respondent-father completed renovations on the family home, increasing the number of bedrooms from three to six, and that a bedbug infestation had been resolved. Respondent-mother asserted that the children were not visiting each other regularly, and believed that several of the children's behavioral issues were related to their placement in other homes. She also discussed budgeting, paying bills on time, and developing chore charts and house rules, and opined that she and respondent-father had benefited from the services offered throughout their case. Respondent-mother acknowledged that TB1 and TB2 missed a substantial number of school days, but did not believe there was a violation of the school's truancy policy because, she claimed, the school suspended the policy during the 2021-2022 school year due to the pandemic. She further believed that TB2 and IB could be reintegrated into the home together, despite concerns about inappropriate sexual conduct between the two, because they were bonded. Respondent-mother did not believe it would negatively affect IB to be in the same home as TB2. She also believed that her greatest strength as a parent was her ability to listen to her children and understand them. Respondent-mother acknowledged needing to improve her housekeeping skills, and, contrary to Chevalier's testimony, claimed that she used the disciplining skills she learned in parenting classes.

The parties rested after respondent-mother's testimony, but the trial court recalled Chevalier. Chevalier testified that although respondents received services for approximately 14 years, they did not benefit from them. She opined that respondents continued to engage in the same poor parenting that led to removal in 2019, continued to blame others, and failed to take responsibility for their own actions. In Chevalier's opinion, there was no reasonable likelihood that either respondent would be able to properly parent the children within a reasonable time. She conceded, however, that respondents could probably parent TB1, who was turning 18 years old in April 2023, and potentially TB2. Chevalier did not believe, however, that reunification was in the children's best interests. She explained that the children had been removed twice now and respondents kept repeating the same pattern of poor parenting. Chevalier opined that returning the children to respondents would be neglectful. She also believed that although the children were not similarly situated, they each needed stability, permanency, and finality. And Chevalier reiterated that although respondents participated in services, they did not benefit from them.

After the termination hearing, the trial court, in early November 2022, terminated respondents' parental rights to TB2, IB, CB1, CB2, AB2, EB, and SB. In a detailed opinion, the court concluded that the children were not similarly situated and, therefore, it addressed the best interests of the children individually. The trial court found termination was not in TB1's best interests. The court entered an order consistent with its written opinion, terminating respondents' parental rights to seven of their nine children. This appeal followed.

## II. STANDARDS OF REVIEW

"If the court finds that there are grounds for termination of parental rights and that termination of parental rights is in the child's best interests, the court shall order termination of parental rights and order that additional efforts for reunification of the child with the parent not be

made." MCL 712A.19b(5). We review for clear error the trial court's decision that statutory grounds for termination have been proven by clear and convincing evidence, as well as its determination that termination is in a child's best interests. *In re Olive/Metts Minors*, 297 Mich App 35, 40; 823 NW2d 144 (2012). "A trial court's decision is clearly erroneous if although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been made." *Id*. "Best interests are determined on the basis of the preponderance of the evidence." *In re Keillor*, 325 Mich App 80, 93; 923 NW2d 617 (2018) (quotation marks and citation omitted). "This Court gives deference to a trial court's special opportunity to judge the weight of the evidence and the credibility of the witnesses who appear before it." *In re TK*, 306 Mich App 698, 710; 859 NW2d 208 (2014).

This Court reviews a trial court's decisions regarding parenting time for an abuse of discretion. See *In re Laster,* 303 Mich App 485, 490; 845 NW2d 540 (2013), superseded by statute on other grounds as recognized by *In re Ott*, ___ Mich App ___, ___; ___ NW2d ___ (2022) (Docket No. 362073); slip op at 7-11. A trial court abuses its discretion when it selects an outcome outside the range of reasonable and principled outcomes. *In re COH,* 495 Mich 184, 202; 848 NW2d 107 (2014).

## III. STATUTORY GROUNDS

Both respondents argue that the trial court erred by finding that clear and convincing evidence supported termination of their parental rights under MCL 712A.19b(3)(c)(*i*). We disagree.

Though MDHHS sought termination in the supplemental petition under MCL 712A.19b(3)(c)(*i*) and (g), the trial court terminated respondents' parental rights under MCL 712A.19b(3)(c)(*i*) only. MDHHS need only establish one statutory ground to support an order terminating parental rights. *In re Ellis*, 294 Mich App 30, 32; 817 NW2d 111 (2011). A court may terminate parental rights under MCL 712A.19b(3)(c)(*i*) if it finds clear and convincing evidence of the following:

> (c) The parent was a respondent in a proceeding brought under this chapter, 182 or more days have elapsed since the issuance of an initial dispositional order, and the court, by clear and convincing evidence, finds either of the following:

> (*i*) The conditions that led to the adjudication continue to exist and there is no reasonable likelihood that the conditions will be rectified within a reasonable time considering the child's age.

Termination is appropriate under MCL 712A.19b(c)(*i*) when the "totality of the evidence" supports a finding that the respondent-parent did not "accomplish[] any meaningful change in the conditions" that led to the adjudication. *In re Williams*, 286 Mich App 253, 272; 779 NW2d 286 (2009). The court must also find that "there is no reasonable likelihood that the conditions will be rectified within a reasonable time considering the child's age." MCL 712A.19b(3)(c)(*i*). What constitutes a "reasonable time" requires consideration of how long the parent will take to improve the conditions and how long the children can wait for the improvements to occur. See *In re Dahms*, 187 Mich App 644, 648; 468 NW2d 315 (1991).

-8-

The trial court did not clearly err when it found clear and convincing evidence supporting termination under MCL 712A.19b(3)(c)(*i*). The record established that respondents had a long history with CPS, dating back at least 15 years. In 2008, CPS first investigated respondents for complaints of physical neglect related to AB1, TB1, and TB2. During the 10 years that followed, respondents had six more children, and CPS, on multiple occasions, investigated complaints of neglect. In these earlier years, CPS offered respondents preventative services in an effort to avoid court intervention and removal of the children. But after approximately 10 years of voluntary services, MDHHS concluded that respondents continued to expose the children to risks of harm. Consequently, in December 2017, MDHHS, citing the unsanitary and deplorable condition of respondents' home, petitioned the court to take jurisdiction and remove the children. In the two years after MDHHS filed its petition, respondents participated in and allegedly benefited from a treatment plan designed to address their unsuitable housing and poor parenting skills. Eventually, in February 2019, contrary to MDHHS's recommendations, the trial court returned the children to respondents' care and closed the case.

The evidence established that the children's return home after the conclusion of the 2017-2019 case was only nine months. In mid-November 2019, respondent-mother left three of the younger children home alone sleeping while she drove some of her other children to school. After respondent-mother left, AB2 awoke and left the house, apparently searching for her mother. A passing motorist found AB2 walking alone on the shoulder of M-35 and took her home. As noted earlier, when CPS and the police arrived, respondents' home was in poor condition. The home was littered with garbage, toys, clothing, and other household items, much of the floor was not visible, and clutter obstructed stairways and doorways.

This incident prompted MDHHS to seek termination of respondents' parental rights under MCL 712A.19b(3)(g) and (j). In addition to allegations of improper supervision, MDHHS's petition alleged that the home was unsanitary and in a condition unsafe for the children. While respondents awaited a trial date on the petition, respondent-mother gave birth to SB. After SB's birth, MDHHS petitioned the trial court to take jurisdiction over the newborn. Shortly thereafter, MDHHS agreed to remove the request for termination of parental rights from the 2019 petition and respondents entered pleas admitting that they failed to properly supervise their children and that the home was in a condition unfit for the children, thereby allowing the court to exercise jurisdiction over all of the children. During the dispositional hearing that immediately followed adjudication, the trial court ordered respondents to comply with and benefit from a treatment plan designed to enhance their parenting skills and improve the condition of their home. In early January 2022, approximately 15 months into the treatment plan (and substantially beyond the 182 days from the initial dispositional order), MDHHS filed a supplemental petition seeking termination under MCL 712A.19b(3)(c)(*i*) and (g). It alleged that respondents had failed to benefit from the services.

At the April and June 2022 hearings on the supplemental petition, MDHHS presented evidence that respondents substantially complied with their treatment plan during the 20 months following the initial disposition, but that neither respondent benefited from the services offered. That is, neither respondent had progressed to the point that the children would be safe in their care. The evidence also established that there was no reasonable likelihood that respondents would be in a position to safely and appropriately parent their children within a reasonable time.

The record clearly demonstrates that respondents were unable to overcome the most significant barrier to reunification, namely, their poor parenting skills. Between 2008 and 2017, CPS offered respondents a variety of voluntary preventative services. After the children were removed from the home in 2017, respondents participated in court-ordered services for another two years, including participation in the Family Reunification Program, counseling, and a mentorship program. When the children were removed for a second time in November 2019, respondents were again ordered to participate in services designed to teach them how to manage their nine children, impose age-appropriate discipline, and ensure that the children would be safe in their care. Services included participation in an 18-week Parenting for Success program, video parenting instruction through Pregnancy Services, and assistance from a parent-aid that came into the home weekly for six months to provide hands-on assistance to respondents. Testimony from Chevalier, the foster care specialist, and various service providers demonstrated that respondents were not receptive to the instructions offered and that they did not use the tools provided to ensure their children's safety and well-being.

Maycroft, the visitation supervisor, testified that respondents were overwhelmed during parenting time and were unable to control, monitor, or care for their children, particularly the younger ones. During parenting time, the children were "completely out of control" and the visits were chaotic. When parenting time was held in the family home, the children climbed on unsecure furniture and cabinets, left the house unnoticed, and occasionally entered an unsafe and dilapidated camper on the property. When parenting time was moved to a church because of a bedbug infestation in the home, the younger children frequently ran out the door during visits. At virtually every visit, Maycroft had to alert respondents that the children had left the building. Maycroft testified that over the many years she worked with respondents, the circumstances had not improved but had, instead, worsened over time.

The testimony of parent-educator Amanda Bloxton-Kippola and foster care specialist Jessica Chevalier similarly illuminated respondents' inability to properly parent, supervise, and discipline their children. These witnesses described instances during parenting time where respondents failed to adequately supervise the children around the trampoline and left five-year old AB2 unsupervised long enough for the child to find the keys and start a riding lawnmower. They also left toxic chemical products in the children's play area, and allowed TB2 access to everything he needed to start a large fire on the driveway. From this testimony, the trial court could reasonably find that respondents' poor parenting created safety issues for the children.

Chevalier also testified that respondents failed to properly and promptly secure a dilapidated camper that was stored on the property. The camper was in such a state that the children could easily be injured while playing inside. Chevalier also discussed having received police reports about inappropriate sexual conduct occurring in the camper between TB2, IB, and CB1. Further, as part of a safety plan, respondents were supposed to store lighters in the camper and out of reach of the children. Throughout most of 2021, Chevalier instructed respondents to promptly and properly secure the camper, but they failed to do so. Restricting access to the camper was particularly important because, between April and December 2021, the three oldest teenage children were returned to respondents' unsupervised care. When respondents eventually installed a lock, they did not consistently use it. Similarly, they did not consistently lock the garage. These failures allowed TB2 to locate materials to start more than one fire in October 2021, and six-year-old AB2 to play in the unlocked camper in the summer of 2021. Chevalier also testified that

despite years of services, respondents could not provide age-appropriate redirection, impose appropriate discipline, or develop a home structure and routine that benefited all of the children.

Particularly compelling were events that occurred when the three oldest children were allowed to return to the home for several months in 2021. In April 2021, the court permitted AB1, TB1, and TB2 to return to respondents' care. In December or November 2021, the school requested its truancy officer to investigate TB1's and TB2's failure to regularly attend classes.[5] Truancy Officer Amy Calouette discovered that the teenagers had missed approximately 60 of the 70 days that school had been in session. This was not the first time these children had missed a substantial amount of school. During the statutory-ground hearings, Calouette testified that truancy issues initially arose in November 2019, near the time the children were first removed from the home. That investigation was closed after TB1 and TB2 were placed with relatives and their attendance improved dramatically.

The evidence clearly and convincingly demonstrated that at the time of termination, the conditions that led to the adjudication continued to exist. The record also established that there was no reasonable likelihood respondents would be in a position to safely and appropriately parent their children within a reasonable time. For years, CPS offered respondents preventative services. After MDHHS filed petitions in 2017 and 2019, the court ordered respondents to comply with treatment plans. Respondents had years to make meaningful improvements in their parenting skills but failed to do so. Though MDHHS must expend reasonable efforts to provide services to secure reunification, respondents have a commensurate obligation to participate in and benefit from the services offered. *In re Frey,* 297 Mich App 242, 248; 824 NW2d 569 (2012). Respondents failed to adequately address the barriers to reunification and gained no insight into the issues that separated them from their children. Because respondents were unwilling or unable to make meaningful changes, clear and convincing evidence supported the trial court's conclusion that the conditions that led to the adjudication would not be rectified within a reasonable time.

Termination of parental rights under MCL 712A.19b(3)(c)(*i*) is warranted when "the totality of the evidence amply supports" a finding that the parent has not achieved "any meaningful change" in the conditions that led to the trial court assuming jurisdiction of the child. *In re Williams,* 286 Mich App at 272. MDHHS met this evidentiary burden by clear and convincing evidence. The trial court therefore did not clearly err when it found clear and convincing evidence to terminate respondents' parental rights under MCL 712A.19b(3)(c)(*i*).

IV. BEST INTERESTS

---

[5] Respondents' oldest daughter, AB1, similarly was not attending school. By July 2021, however, she had turned 18 years old and the trial court terminated its jurisdiction over her.

In Docket No. 364110, respondent-mother argues that the trial court erred in concluding that termination of her parental rights was in the children's best interests. We disagree.[6]

In termination proceedings, the trial court must weigh all the evidence, within the entire record, to determine the children's best interests. See *In re Trejo*, 462 Mich 341, 356-357; 612 NW2d 407 (2000); *In re White*, 303 Mich App 701, 713; 846 NW2d 61 (2014). "The focus at the best-interest stage has always been on the child, not the parent." *In re Payne/Pumphrey/Fortson Minors*, 311 Mich App 49, 63; 874 NW2d 205 (2015) (quotation marks, citation, and brackets omitted). The trial court must consider each child individually and assess the best interests of each child separately, unless the children are similarly situated. *In re TK*, 306 Mich App at 711 (citation omitted).

"To determine whether termination of parental rights is in a child's best interests, the court should consider a wide variety of factors that may include the child's bond to the parent, the parent's parenting ability, the child's need for permanency, stability, and finality, and the advantages of a foster home over the parent's home." *In re White*, 303 Mich App at 713 (quotation marks omitted). "The trial court may also consider a parent's history of domestic violence, the parent's compliance with his or her case service plan, the parent's visitation history with the child, the children's well-being while in care, and the possibility of adoption." *Id*. at 714. The trial court must also "explicitly address each child's placement with relatives at the time of the termination hearing." *In re Olive/Metts Minors*, 297 Mich App at 44. A court's failure to address the child's placement with a relative is clear error requiring the best-interests finding to be vacated. *Id*. A child's placement with relatives weighs against termination. *In re Mason*, 486 Mich 142, 164; 782 NW2d 747 (2010). The trial court must state on the record or in writing its findings of fact and conclusions of law regarding its best-interest determination. See MCL 712A.19b(1); MCR 3.977(I)(1).

Although they shared many of the same needs and interests, in several respects the children were not similarly situated. Approximately 15 years separated the oldest child at issue from the youngest sibling. And the four oldest children were in relative care, whereas the four youngest children were placed in two licensed foster homes. The trial court recognized the differing attributes and, in its opinion, the court carefully considered the best interests of each child individually. The trial court did not clearly err when it found that termination of respondents' parental rights was in the seven children's best interests.

TB2, respondents' oldest son subject to the termination order, was 15 years old at the time of termination. There was testimony that between 2017 and 2021, the trial court removed TB2 from respondents' care three times, for extended periods.[7] Under these circumstances, TB2 could

---

[6] Although respondent-father does not specifically raise this issue, we similarly conclude that the trial court did not clearly err when it found that termination of his parental rights was also in the children's best interests.

[7] The trial court initially removed TB2 and his siblings from respondents' care from 2017 to 2019, and a second time later in 2019. The court removed TB2 for a third time after he was returned to respondents' home for several months in 2021.

not have any sense of stability or permanence, and a preponderance of the evidence established that respondents were unable to provide these things for him. By contrast, when TB2 was placed with his maternal grandparents and his needs were being met. Chevalier testified that TB2 had benefited greatly from not being in respondents' care. While in the care of his maternal grandparents, TB2 regularly attended school, improved his grades, and socialized with his friends. But when TB2 returned to respondents' home for several months in 2021, he missed approximately 60 of the 70 days school had been in session and his grades slipped. Chevalier also testified that the bond between respondent-mother and TB2 was not healthy, secure, or appropriate. He did not display any respect for respondent-mother, instead treating her "almost as a peer . . . ." Chevalier further testified that the bond between TB2 and respondent-father was limited. By contrast, TB2 was respectful and engaged with his grandparents. The grandparents established rules and expectations that TB2 met. When considering a child's best interests, the court may consider the advantages of a foster home over the parent's home. *In re Olive/Metts,* 297 Mich App at 42.

The trial court may also consider the possibility of adoption. *In re White,* 303 Mich App at 713. In this case, TB2 was placed with his maternal grandparents, but he wished to be adopted by his paternal grandparents, which the trial court acknowledged. If this were not possible, TB2 was content living with his maternal grandparents. In any event, both sets of grandparents were willing to adopt TB2.

The relevant factors, on balance, weighed in favor of terminating respondents' parental rights to TB2. Termination would provide TB2 the stability, finality, and permanence he required. The trial court acknowledged that TB2's placement with the maternal grandparents favored reunification, but it went on to properly balance relative placement with other relevant factors. See *In re White*, 303 Mich App at 713-714 (describing the several relevant factors for determining whether termination is in a child's best interests). Although relative placement weighs against termination, and the trial court must consider this factor, a trial court may terminate parental rights in lieu of placement with relatives if it finds that termination is in the child's best interests. *In re Olive/Metts*, 297 Mich App at 43. Here, the trial court properly balanced the relevant factors and did not clearly err by finding that, despite TB2's placement with relatives, termination of respondents' parental rights was in TB2's best interests.

IB, 13 years old at the time of termination, was placed with her maternal aunt. Since 2017, IB was removed twice from respondents' care and had therefore experienced several years of instability. IB did not want to return to respondents' care and instead wished to be adopted by her maternal aunt. Chevalier testified that a bond existed between IB and the maternal aunt, IB was doing well in her aunt's care, and the aunt had expressed a willingness to adopt IB. The trial court considered the best-interest factors, again recognizing that placement with a relative weighed against termination of parental rights. It concluded, however that termination of respondents' parental rights was in IB's best interests. The trial court did not clearly err. A preponderance of the evidence established that IB's best interests would be served by terminating respondents' parental rights so she could achieve stability and finality through adoption by her maternal aunt.

Eleven-year-old CB1 was also placed with the same maternal aunt as IB. Although CB1 wished to return to respondents' care, Chevalier believed that CB1's desire was partly because she felt bullied living with IB and some of her cousins. The maternal aunt admitted that IB and her own children were mean to CB1. Because of this dynamic, Chevalier spoke with the foster parents

-13-

caring for CB2 and AB2. The foster mother, D. Hirn, was willing to bring CB1 into her home and adopt her along with CB1's other siblings living in the Hirn foster home. CB1, like her older siblings, had experienced the instability and uncertainty of being moved in and out of foster care and relatives' homes. She required not only stability and permanence, but to be raised in a safe environment. Respondents were not able to provide for CB1's needs. The maternal aunt and Hirn, however, were both willing to provide CB1 the stability, permanence, and finality she needed. Again, when balancing the best-interest factors, a court may consider the advantages of a foster home over the parent's home and the possibility of adoption. *In re White,* 303 Mich App at 713. When considering CB1's best interests, the trial court therefore did not clearly err when it found that these factors weighed in favor of terminating respondents' parental rights.

Nine-year-old CB2 and six-year-old AB2 were placed together in Hirn's licensed foster home, and had been in Hirn's care for approximately two years. Chevalier's testimony suggested that the instability caused by multiple removals from respondents' care was taking its toll on these two children. Their behaviors became deregulated at times during visits with respondents, which caused the children to act out emotionally. CB2 reported to Hirn that there was "too much chaos" and that respondents did not pay attention to her during visits. CB2 expressed a desire to be adopted by her foster parents. AB2 called Hirn "mom" and she wanted to stay in the foster home. These two younger siblings required stability, permanence, and finality. The foster parents wished to adopt both CB2 and AB2 should the court terminate respondents' parental rights. Chevalier also indicted that neither CB2 nor AB2 had a strong bond with respondents. Because, on balance, the factors weighed in favor of termination, the trial court did not clearly err by terminating respondents' parental rights to both CB2 and AB2.

Finally, a preponderance of the evidence also supported the trial court's finding that termination of respondents' parental rights was in the best interests of EB and SB. These two children had been placed together in Ryno's licensed foster home for almost two years. EB was four years old at the time of termination and had spent half of her life outside of respondents' care. SB was placed with Ryno when he was just three days old. Ryno's home was the only one SB had ever known. Both EB and SB looked to Ryno to provide for their care and comfort. The proceedings were clearly taking a toll on EB's emotional well-being. EB talked of having "two mommies." EB also talked about her bedroom in respondents' home, though she had never seen it. Ryno believed that EB was exhibiting behavioral issues because she was confused by the circumstances. Ryno noted that after parenting time, both children acted out. EB would kick, scream, and throw things. SB would cry and scream, and "usually ha[d] meltdowns before bed[.]" These two children needed permanence, stability, and finality. At such a young age, these things were necessary to facilitate their continued growth and development. Respondents, however, were not capable of meeting these children's needs. The record supports a finding that respondents were unable to safely parent their two youngest children and would not be able to do so within a reasonable time. By contrast, Ryno was willing and able to provide the children with the care and permanence they required. The foster home had an advantage over respondents' home, and there existed the likelihood of adoption. See *In re Olive/Metts,* 297 Mich App at 41-42. Termination of respondents' parental rights was thus the best avenue for EB and SB to achieve the stability, permanence, and finality they needed. Accordingly, the trial court did not clearly err when it found that termination of respondents' parental rights was in EB's and SB's best interests.

From this record, the trial court did not clearly err when it found that termination of respondents' parental rights was in the best interests of the seven children. The court properly weighed the appropriate factors when considering all of the children's best interests. A preponderance of the evidence weighed in favor of terminating respondents' parental rights to each of the seven children.

## V. UNSUPERVISED PARENTING TIME

Finally, respondent-father argues in Docket No. 364162 that the trial court abused its discretion when it refused to grant unsupervised parenting time between respondents and the youngest six children following a hearing in October 2021. We disagree.

MCL 712A.13a(13) provides that "[i]f a juvenile is removed from the parent's custody at any time, the court shall permit the juvenile's parent to have regular and frequent parenting time with the juvenile." Recently, in *In re Ott,* ___ Mich App at ___; slip op at 8-9, quoting MCL 712A.13a(13), this Court held that a parent is entitled to parenting time with a child who has been removed from his care unless it "may be harmful to the juvenile's life, physical health, or mental well-being." But the statute does not distinguish between supervised or unsupervised parenting time. *Id.*

The trial court did not abuse its discretion when it concluded that the children would have been at risk of harm if it granted respondents unsupervised parenting time. During a late July 2021 hearing, the trial court indicated that it would allow respondents to have unsupervised parenting time with the six youngest children, who were then between the ages of 9 months and 12 years old, but only if the parties formulated a plan allowing the gradual implementation of unsupervised visits. This was a rational and measured approach. In early September 2021, the parties stipulated to allow unsupervised parenting time, and the trial court held an evidentiary hearing on the issue in early October 2021. In its written opinion that followed, the trial court denied respondents unsupervised parenting time. The court noted that the circumstances had changed since the parties filed the stipulation in September 2021. Most notably, the trial court referred to events that occurred four days before the October 2021 hearing.

According to testimony at the hearing, Bloxton-Kippola witnessed TB2 start a large fire on the driveway when he attempted to fire a homemade metal pipe cannon using approximately one quart of gasoline. The trial court found that if the flames had reached a nearby five-gallon gas can, the results would have been catastrophic. The court also found it compelling that TB2 used a dismantled butane lighter that he found in the garage to light the fire, that the lighters were supposed to be locked in a camper on the property, and that despite this, the camper was not locked at all times. The trial court noted that a fire extinguisher in the garage could not be used to put out the fire because it had been discharged to put out another fire TB2 had recently started. There was also testimony that, on another recent occasion, TB2, while in the home, "sprayed bug spray over lit candles." In light of the testimony, the children's guardian ad litem changed her recommendation and would no longer support or stipulate to unsupervised parenting time. Based on the record that was created at the hearing, the trial court found that it would not be in the younger children's best interests to have unsupervised parenting time with respondents.

The trial court never denied or suspended respondent-father's parenting time. And although it denied respondent-father's request for unsupervised parenting time, respondent-father continued supervised visitation with his children. The court's order fully complied with the requirements of MCL 712A.13a(13). The trial court also did not abuse its discretion when it maintained supervised parenting time. Respondents' negligent and neglectful supervision of TB2 in early October 2021, and on other days, could have had catastrophic consequences. Considering the testimony at the evidentiary hearing, the requirement that visits between respondents and their children remain supervised for the safety of all the children was within the range of reasonable and principled outcomes. The trial court therefore did not abuse its discretion.

We affirm.

/s/ Elizabeth L. Gleicher
/s/ Kathleen Jansen
/s/ Noah P. Hood